IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Richard K. Niemi, et al.                                              3:03CV7512

    Plaintiffs,

v.                                                                    ORDER

NHK Spring Co., Ltd., et al.

    Defendants.

This is a suit by Richard K. Niemi alleging that New Mather Metals, Inc. (Mather), a subsidiary of NHK Spring Co., Ltd. (NHK Spring), improperly acquired and used his designs for fabricating stabilizer bars for automobiles. Presently pending are counts for breach of contract and promissory estoppel against Mather.

Mather has filed a motion for summary judgment as to both counts. For the reasons that follow, its motion shall be granted.

**Background**

Niemi has designed and invented machines for the auto industry for over forty years. Even though he did not have much formal education, he was able to help design stabilizer bars for several clients. In 1987, he started his own design company, Richard K. Niemi Design and Engineering. In 1997, he and his son, who had been working with him, formed RKN Technologies, LLC (also a named plaintiff). Mather, a subsidiary of a Japanese corporation, has been a client of Niemi's since at least 1990.

Before 1990, Niemi devised a new method of producing stabilizer bars. In 1990, he informed Denzil Sheckler, a tool engineer for Mather, about his new process. After Sheckler learned about the process, Mather started using it. Mather's operations allegedly experienced greater efficiencies and lower costs as a result of the new process.

Niemi claims that in the early 1990's, he and Mather entered into a written agreement for Mather's exclusive use of Niemi's concept. In his complaint, Niemi alleges that he and Mather agreed that

> in exchange for Defendant maintaining the secrecy of Plaintiff's trade secret process, and agreeing to award Plaintiff and his company . . . the exclusive right to perform all design work for [Mather], [Mather] would be allowed to use Plaintiff's trade secret process, for the manufacturer [sic] by it of stabilizer bars.

It was further agreed, according to the complaint, that Mather "would prevent disclosure of Plaintiff's trade secret process, and maintain its secrecy, in the absence of permission from Plaintiff to divulge the trade secret process."

Niemi alleges that in 1993-1994, Mather employee Al Blackwood reaffirmed that Niemi would be Mather's sole designer, and that upper-level, decision-making managers at Mather approved of the exclusivity arrangement. Niemi claims to have signed a written agreement that he would not disclose the process to any third party, and then Blackwood signified orally that Niemi would remain the exclusive design source for Mather. No documentation for the alleged agreement, however, has been presented by Niemi.

In 1998, Niemi saw evidence that someone else had been doing design work for Mather. He first confronted Cornieles, a manager for Mather who reported to Malcom, the President and CEO of Mather. A few days later, Cornieles spoke to Mark Niemi on the phone, asking him if he wanted Niemi's company to be Mather's design source, to which Mark Niemi answered in the affirmative.

Shortly thereafter, Niemi had a meeting with Malcom on the issue of exclusivity. Malcom denied knowing about any exclusivity agreement and said that he would "get back to" Niemi after running things past "the Japanese." Niemi never heard from Malcom again.

## Discussion

Mather moves for summary judgment, claiming that Niemi's causes of action are barred by the statute of frauds, and that Niemi has failed to show a genuine issue of material fact with respect to several elements of his promissory estoppel claim. The parties also raise issues of quantum meruit, lack of consideration, and standing.

### 1. Statute of Frauds

### A. Breach of Contract Claim

In 2002, Niemi testified during a deposition that his alleged agreement with Mather was perpetual. Mather filed a motion for summary judgment in January, 2005, arguing, *inter alia,* that the alleged contract was, according to Niemi's own testimony, perpetual, and that it therefore fell within the statute of frauds. In June, 2005, after the summary judgment motion was fully briefed, Niemi successfully moved to amend his complaint to add a claim for promissory estoppel. Ruling on the then-pending motion for summary judgment was held in abeyance to permit discovery to be completed.

In November, 2006, Niemi underwent another deposition, during which he testified that his alleged confidentiality/exclusivity agreement with Mather was not perpetual. Instead, he testified that the contract would cease to operate if Mather stopped using the equipment. His 2006 testimony is contradicted his 2002 testimony regarding the time frame and conditions of his alleged contract with Mather.

A party cannot avoid summary judgment with affidavits or other evidence contrary to prior deposition testimony. *See, e.g., Aerel, SRL v. PCC Airfoils, LLC,* 448 F.3d 899, 908-09 (6th Cir. 2006) (affidavit should not be considered when it "directly contradicts" earlier testimony, or, alternatively, if it creates a sham issue of fact); *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). Allowing such a practice would undercut the purpose of summary judgment motions and permit parties to conjure up facts to prolong their cases. *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir. 1984).

It is also permissible for courts to disregard self-contradictory evidence for the purposes of summary judgment on the basis that any information therein is not probative. *Penny v. UPS*, 128 F.3d 408, 416 (6th Cir. 1997) ("We do not believe such an inherently contradictory statement constitutes the 'significant probative evidence tending to support the complaint' required to withstand a motion for summary judgment.") (citation omitted).

Each of these lines of authority bars Niemi's 2006 statements about the duration of the alleged confidentiality/exclusivity contract with Mather from consideration with regard to Mather's pending motion for summary judgment. Those statements were elicited only after Mather had raised the statute of limitations issue in its original motion for summary judgment, and they contradict prior

4

sworn testimony on the precise issue.[1] Niemi's 2006 testimony about the time frame of the alleged contract will therefore not be considered for purposes of the summary judgment motion.

The only other evidence raised by plaintiffs that is relevant to the statute of frauds issue is deposition testimony by Niemi's son, Mark Niemi. He testified, also in November, 2006, in a nearly identical fashion to his father, saying that his father's oral agreement with Mather would only last until Mather stopped using Niemi's system.

The "specific facts" required from an adverse party to a summary judgment motion need not be admissible, but must be "reducible to admissible evidence." Fed. R. Civ. P. 56(e) ("[A]n adverse party . . . must set forth specific facts showing that there is a genuine issue for trial."); *Catrett v. Johns-Manville Sales Corp.*, 826 F.2d 33, 37-38 (D.C. Cir. 1987); *see also Miller v. St. Elizabeth Hosp. Medical Center*, 1992 WL 214520, at *2 n.3 (6th Cir.) (Unpublished disposition) (affirming summary judgment on plaintiff's claim when she could not prove "whether [her] evidence could have been reduced to admissible form at trial").

Mather argues that Mark Niemi's testimony is hearsay lacking any foundation because he was not present when the parties made their alleged oral agreement. Niemi has not pointed to any facts that would refute Mather's hearsay objection, nor has he pointed to any facts to suggest that

---

[1] Even assuming, *arguendo*, that Niemi's 2006 testimony did not directly contradict his 2002 testimony, Niemi's later testimony also had the effect of creating a sham issue of fact similar to that described in *Aerel*. 448 F.3d at 908-09 (citing *Franks v. Nimmo*, 796 F.2d 1230 (10th Cir. 1986)). The court in *Franks* stated that the relevant factors in determining whether a sham issue of fact has been created include "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." 796 F.2d at 1237. Although not perfectly translatable to a situation where, as here, there is a direct contradiction between two separate depositions, an application of the *Franks* factors suggests that Niemi seeks improperly to raise a sham issue of fact.

an exception to the hearsay rule would apply. Mark Niemi's testimony on the time frame of the alleged oral agreement cannot, therefore, create a genuine issue of fact with respect to the statute of frauds issue, because Niemi has not provided any indication that the testimony could be "reducible to admissible evidence." *Catrett*, 826 F.2d at 37-38.[2]

## B. Promissory Estoppel Claim

Even though an oral agreement might otherwise be barred by the statute of frauds, it is still possible to state a claim for promissory estoppel and recover. Such recovery will be possible, for instance, if there was a misrepresentation that the statute had been complied with, or if there was a promise to reduce the oral agreement to writing later. *McCarthy, Lebit, Crystal & Haiman Co., LPA v. First Union Mgmt., Inc.*, 87 Ohio App. 3d 613, 627 (1993). Ohio law is less clear on whether a claim for promissory estoppel may avoid the effect of the statute of frauds outside of those two circumstances, and the Ohio Supreme Court has not yet ruled on the precise issue.

Some Ohio cases clearly state that claims for promissory estoppel are susceptible to the statute of frauds absent a misrepresentation that the statute was complied with or a promise to reduce the oral agreement to writing. *Landskroner v. Landskroner*, 154 Ohio App. 3d 471, 488-89 (2003); *McCarthy, supra*, 87 Ohio App. 3d at 627. Other Ohio cases, however, have declined to place such restrictions on the use of promissory estoppel, especially where the parties are not "equal in bargaining position and knowledge." *Poskocil v. Cleveland Institute of Music*, 1997 WL 209265,

---

[2] Niemi also asserts that the contract could have been fully performed within a year if Niemi had violated his pledge of confidentiality before the first year passed. The ability for a contract to be fully performed in a year, however, is much different from the ability for a contract to be breached within a year, and the contract alleged here cannot escape the statute of frauds merely through the possibility of an early breach. *See Ohanian v. Avis Rent A Car System, Inc.*, 779 F.2d 101, 107-08 (2d Cir. 1985) ("A contract is not 'to be performed within a year' if it is terminable within that time only upon the breach of one of the parties.").

*4 (Ohio App.); *see also* *Connolly v. Malkamaki*, 2002 WL 31813040, *4-5 (Ohio App.) (declining to apply the rule stated in *McCarthy, supra*).

Because Niemi was relatively less sophisticated than Mather, and the Supreme Court of Ohio has yet to adopt a firm rule, summary judgment via the statute of frauds shall not be granted as to plaintiff's promissory estoppel claim.

### 2. Promissory Estoppel: Merits

Under the doctrine of promissory estoppel, "'[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'" *McCroskey v. State*, 8 Ohio St.3d 29, 30 (1983). Mather contends that Niemi has failed to show a genuine issue of fact with respect to several elements of his promissory estoppel claim, including: 1) the reasonableness of Niemi's reliance on Mather's alleged oral promise; and 2) existence of injury.

### A. The Reasonableness of Reliance

Mather argues that Niemi's reliance on its alleged oral promise was unreasonable, and thus, he cannot maintain an action for promissory estoppel. In its attempt to show the unreasonableness of Niemi's reliance, Mather points to Niemi's sophistication as a party and the fact that Blackwood lacked the authority to bind the company.

Mather first contends that Niemi was an experienced businessman and that his promissory estoppel claim is thus barred. Mather argues that under Ohio law, a party cannot advance a claim for promissory estoppel when the agreement was an arms length transaction between sophisticated parties. *Carcorp, Inc. v. Chesrown Oldsmobile-GMC Truck, Inc.*, 2007 WL 259248, at *4 (Ohio

7

App.). Although Niemi had several years of experience in engineering, it is undisputed that Niemi had only a high school education and ran his business from his home. It cannot, therefore, be stated as a matter of law that Niemi was a sophisticated business party.

With regard to Blackwood's authority to bind Mather, Niemi responds by saying that he did not rely solely on the representations of Blackwood, whom Niemi describes as a "mid management level employee who Niemi clearly knew did not have authority to bind [Mather]." Instead, after Niemi discovered that the alleged oral agreement had been breached, plaintiffs confronted Cornieles, a manager at Mather who reported to the CEO, and Mather's President and CEO, Mr. Malcom. Although Malcom told Niemi to consult instead with upper-level Japanese officials such as Mr. Shiota, Niemi contends that Mr. Shiota was merely a technical adviser.

To prevail on a claim for promissory estoppel, one's reliance on the other's promise must be reasonable. *McCroskey v. State*, 8 Ohio St. 3d at 30; *Telxon Corp. v. Smart Media of Delaware, Inc.*, 2005 WL 2292800, *22 (Ohio App.).

Niemi relies mainly on three sets of conversations - with Blackwood in 1993-94, Cornieles in 1998, and Malcom in 1998 - to support his claim of promissory estoppel. According to Niemi himself, it would have been unreasonable to rely on Blackwood's oral promise, and therefore the soonest Mather could possibly be bound would be in 1998, following conversations with manager Cornieles and President and CEO Malcom.

Niemi confronted Cornieles about the fact that third parties had apparently been doing design work for Mather. Cornieles later had a telephone conversation with Mark Niemi about the relationship between Niemi and Mather. The parties dispute whether Cornieles's comments during that conversation amounted to a promise to give all Mather's design work to Niemi. In view,

8

however, of the clear avoidance of any such commitment by Malcom, Cornieles's supervisor, it would have been unreasonable for Niemi to rely on any concurrent promise by Cornieles of exclusivity.

As Niemi freely admits, he only confronted Cornieles and Malcom in 1998 after learning that Mather was allowing other companies to perform design work. More importantly, Malcom never recommitted to any alleged confidentiality/exclusivity agreement, but instead said that he would have to run the idea past "the Japanese" first, telling Niemi that he would give him an answer afterward. Malcom thereafter left his position with Mather without having contacted Niemi about what the "Japanese" had to say about his concerns and any putative promise or commitment. As Niemi acknowledged, "Nobody ever got back to me."

Niemi's claim for promissory estoppel must therefore fail for four reasons. First, as Niemi admits, it would have been unreasonable for Niemi to rely on Blackwood's alleged oral promise in 1993-94. Second, there was no promise or recommitment made to Niemi in 1998 by Malcom. Malcom said he would "get back to" Niemi but never did so. Third, it would have been unreasonable to rely on any commitment from Cornieles when his supervisor, Malcom, was at the same time avoiding any and all such promises. Finally, any alleged commitment that Malcom or Cornieles may have made to Niemi during his 1998 conversations would have been unreasonable to rely on, based on Malcom's statement that he would have to run any such decision by the Japanese.

### B. Injury From Reliance

Mather argues that Niemi has not shown any evidence of an actual injury resulting from reliance on Mather's alleged promise. According to Mather, any reliance on Niemi's part has not

9

kept him from doing design business for other firms or providing design solutions other than the "Niemi process" to potential clients.

Mather also claims that the "Niemi process" would not necessarily have made the design process any less expensive for Niemi's clients. It also asserts that Niemi could not remember losing any clients because of his alleged agreement with Mather.

While it is true that Niemi has yet to show a specific level of damages, the evidence as to damages now available does not entirely preclude such a finding. Moreover, and most importantly, because I ordered the parties to restrict discovery to the issue of liability before summary judgment practice, judgment as to the existence and extent of an injury would be premature.

**3. Quantum Meruit**

Niemi's opposition to Mather's summary judgment motion raises for the first time a claim for quantum meruit. Niemi has had ample time to amend his complaint and has done so once already. He cannot now assert a brand new cause of action with differing elements at the eleventh hour of these proceedings.

As the Sixth Circuit stated in *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 740 (6th Cir. 1999) (citation omitted), if an amendment is to be accepted at this point, "the facts of the case must show that 'the amended cause of action is not so different as to cause prejudice to the defendants . . . .'"

The elements of a quantum meruit claim include: "'1) [v]aluable services were rendered or materials furnished, 2) for the person sought to be charged, 3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him, 4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff, in performing such services

was expecting to be paid by the person sought to be charged.'" *J. Lewis Madorsky Co., L.P.A. v. Nolan*, 992 F.Supp. 945, 950 (N.D. Ohio 1998) (quoting *Sonkin & Melena Co., L.P.A. v. Zaransky*, 83 Ohio App.3d 169, 175 (Ohio App. 1992)).

The elements of plaintiffs' quantum meruit claim, and the possible defenses thereto, differ sufficiently from Niemi's previously pleaded claims that allowing the quantum meruit claim to proceed would prejudice Mather. Among other discrepancies between the causes of action is that liability only attaches under quantum meruit once a plaintiff shows his goods or services had value. Thus far, I have not required the parties to conduct extensive discovery on issues such as the financial benefits to Mather from Niemi's design or costs Niemi incurred in developing his design, as that information relates more damages than to liability.[3]

As explained *supra*, I instructed the parties to conduct discovery primarily on the issue of liability for the purposes of their summary judgment motions. Had Niemi raised the issue of quantum meruit earlier, I may have expanded the scope of discovery so that all of Niemi's claims, including the new quantum meruit claim, could be addressed in a dispositive motion. Now that summary judgment has been fully briefed, it would be unfair to require Mather to expend the time and money on additional discovery, just so it may explore yet another summary judgment motion on Niemi's newly introduced claim. For these reasons, Niemi's belated effort to interject the issue of quantum meruit will be disregarded.

### 4. Lack of Consideration

---

[3] I note that Niemi alleges that, as a result of his design work for Mather, the company went from being unprofitable to being very profitable. That allegation, without more, is not enough to justify allowing Niemi to introduce a claim of quantum meruit at this stage of this case, which has been pending for more than three years and already involved extensive motion practice testing the adequacy of Niemi's contentions and allegations.

Mather also argues, in a footnote in its reply brief, that there is no consideration for the contract that Niemi claimed was breached. Mather argues that, because Niemi entered into a written agreement in 1991 that covered the same ground as the alleged 1993-94 oral agreement, there could be no consideration for he 1993-94 agreement.

The 1991 agreement, a copy of which has been produced, in no way precludes a finding that the alleged 1993-94 agreement involved mutual consideration. The 1991 agreement stated that "[i]n consideration of [Mather] granting [Niemi] permission to enter its Toledo, Ohio facility," Niemi agreed not to disclose "all information which [he] may acquire or obtain therein or in conjunction with [his] visit." Niemi, however, was the one who gave his design to Mather, and the idea that Niemi could subsequently "acquire" or "obtain" that very same design, by the act of visiting Mather's facility, is without merit. How could Niemi "acquire" or "obtain" a design which he already possessed, and which he had devised?

Mather's lack of consideration argument [which, being first offered in its reply brief, is not properly raised], belies, in any event, the text on which it is based.

### 5. Standing

Mather also argues that RKN Technology, LLC (RKN) lacks standing to join in Niemi's claims, because that company did not exist at the time of the alleged oral promise, and because plaintiffs have not shown that Niemi transferred his ownership interest to RKN. If such transfer did occur, Mather argues that RKN may remain as a plaintiff but that Niemi should be dismissed because he no longer has an interest in the claims before the court. So, according to Mather, one or the other may have standing, but not both.

The United States Supreme Court has "repeatedly noted that in order to establish Article III standing, '[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Department of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 329 (1999) (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). However, when challenging standing in a motion for summary judgment as opposed to a motion to dismiss, "mere allegations . . . are insufficient." *Id.* at 329. Instead, a plaintiff "must establish that there exists no genuine issue of material fact as to justiciability or the merits." *Id.*

Mather claims that RKN Technology was not formed until 1997. Niemi, however, bases much of his claim for promissory estoppel on events that took place after the formation of RKN. RKN Technology has proven, indisputably, that it was involved in many of those events, and therefore its standing cannot be challenged on summary judgment in the manner that Mather proposes.[4]

It has been determined *supra* that neither Richard K. Niemi nor RKN Technology has proven a genuine issue of material fact as to all the elements of promissory estoppel, which gives rise to summary judgment not on the particular aspect of standing noted by Mather, but on alternate grounds. In any event, the same result is reached whether granting summary judgment on the issue of standing or on the elements of promissory estoppel.

## Conclusion

For the foregoing reasons, it is hereby

---

[4] Also, to the extent that this case is not ripe for summary judgment on the issue of damages, it would be unfair to apply a stringent summary judgment standard on the related question of whether plaintiff has been personally injured, for the purpose of determining standing.

ORDERED THAT:

1. Defendant's motion for summary judgment as to plaintiffs' claims for breach of contract and promissory estoppel be, and the same is hereby granted;

2. Plaintiff's claim for quantum meruit, to the extent advanced herein be, and the same hereby is dismissed as untimely, and asserted without prior leave to do so.

So ordered.

                                                      s/James G. Carr
                                                     James G. Carr
                                                     Chief Judge